FILED
2012 Jun-06  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ILDA CAMPOS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:10-cv-2497-AKK** |
| **COAST PERSONNEL** | ) | |
| **SERVICES INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendants Coast Personnel Services, Inc. ("Coast Personnel") and Benchmark Electronics Huntsville, Inc.'s ("Benchmark") motions for summary judgment against Plaintiff Ilda P. Campos ("Campos"), docs. 29, 31, and Benchmark's motion to strike portions of Sandra Lanier's affidavit testimony submitted by Campos in opposition to summary judgment, doc. 39. For the reasons stated more fully below, the court **DENIES** Benchmark's motion as it relates to the retaliatory discharge claim, but **GRANTS** the motion in all other respects. The court **GRANTS** Coast Personnel's summary judgment motion and **DISMISSES** Coast Personnel **with prejudice**. The court also **DENIES** Benchmark's motion to strike as moot.

A Pretrial Conference will be held on **August 20, 2012 at 8:00 A.M. at the Federal Courthouse in Huntsville, Alabama**. This case is set for jury trial on

October 9, 2012 at 9:00 A.M. at the Federal Courthouse in Huntsville, Alabama.

## I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to

the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the

non-moving party's favor).  However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v.

England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald

Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover,

"[a] mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for

that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing

*Anderson*, 477 U.S. at 252).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This action arises from Campos' former employment with Benchmark. *See*

doc. 1.  Benchmark originally hired Campos, a Hispanic woman from Pedras N.

Coahuila, Mexico, doc. 33-5, at 36, through Coast Personnel, a temporary staffing

agency, in September 2006 for a temporary position at its Bradford facility, *id.* at

62-63.  Campos worked in Benchmark's "quality control" department and earned

$9.50 an hour, *id.* at 61, 75, but Benchmark eliminated her position in January

2007 due to a reduction in work, doc. 36-1, at 3.  About two months later,

Benchmark, again through Coast Personnel, rehired Campos to work in the quality

control department for $9.00 an hour and assigned her to its HSI facility.  Doc. 33-

5, at 71-72, 76.  Coast Personnel's on-site supervisor at Benchmark's HSI facility,

Willette Logan ("Logan"), originally contacted Campos about this position, *id.* at

71, and Robert Rice, Benchmark's Quality Control Manager, hired Campos, *id.* at 72. Campos claims that Philip Cagle ("Cagle"), a Coast Personnel employee, set her $9.00 an hour wage even though Robert Rice promised to pay her the $9.50 rate she earned while working at Benchmark's Bradford facility. *Id.* at 75-76. Cagle denies ever setting Campos' hourly wage, doc. 36-3, at 9, and Logan asserts that Benchmark set the pay rates for Coast Personnel temporary employees, doc. 33-1, at 19.

Campos maintains that David Paden ("Paden"), Campos' immediate supervisor at Benchmark, transferred her to an out-of-box auditor ("OBA") position even though Benchmark hired Campos as an "In Process Inspector" for the HSI facility. *See* doc. 35, at 5-6. However, Campos admits that she began working as an OBA on the first day. Doc. 33-5, at 80-81. Nonetheless, Campos submits affidavit testimony from co-employee Sandra Lanier ("Lanier") that "the Out of Box Auditor is less desirable than Quality Control Inspector position because it is more physically intensive, requires less skill, and less prestigious . . . [and that] being moved from Quality Control Inspector to Out of Box Auditor would have been a demotion." Doc. 36-4, at 2. Moreover, Campos asserts that Benchmark assigned her to work as the sole OBA at the HSI facility even though two people traditionally performed this job. Doc. 33-5, at 145.

Campos also contends that Paden made certain discriminatory remarks. Specifically, Campos claims that in February 2008 Paden mentioned Taco Bell to a co-employee and the two started laughing while looking at Campos—when

Campos complained to Paden about this comment, Paden replied "Don't complain, just do your work."  Doc. 33-5, at 87-89.  Also in February 2008, Paden stated four times, "I won't make my team to learn Spanish," *id.* at 93-94, and made comments about a "Chicano accent," *id.* at 101-02.  Campos again purportedly confronted Paden regarding the offensive nature of these comments, and, after this discussion on February 14, 2008, Paden stopped making similar remarks.  *Id.* at 100.  Campos also complained to Coast Personnel's on-site supervisor Logan and to Benchmark's human resources supervisor (Jayne Anne Higginbotham ("Higginbotham")) and director (Faye Robinson ("Robinson")).  *Id.* at 100, 252. Paden denies making any derogatory or discriminatory comments to Campos and also denies that Campos complained to him.  Doc. 33-4, at 91, 184-85, 188. However, Lanier, a Benchmark employee at the HSI facility, attested to Paden making the statement "'I don't want my employees to have to learn Spanish.'" Doc. 36-4, at 2.

On April 16, 2008, Campos applied for a permanent position with Benchmark as a Quality Control Technician I ("Quality Tech I") in the HSI facility.  Doc. 33-5, at 113.  Paden informed Campos that he needed to sign the application and stated "[b]ring [the application] to me because you are not going to go anywhere if I don't sign it."  *Id.*  Although Benchmark posted this position, Higginbotham testified that Benchmark's corporate office had not actually approved the position.  Doc. 33-3, at 16.  More specifically, the "corporate office in Texas is the one that approved our jobs . . . . [O]ur supervisors or managers

would put in for the number of people they needed.  It would go off to corporate and they would make a decision on whether they approved it or not . . . . I didn't want to, but it would get posted yes.  But I would always put up there unapproved." *Id.*  In other words, "in order to get interest from the people that were already working there through Coast or whatever, we would go ahead and post these [unapproved positions] so that we would have resumes and applications ready for when the job did come open." *Id.* at 23.  And indeed, Campos submits the Benchmark facility's "Job Posting" which states that the Quality Tech I position was "unapproved," doc. 36-5, and admits that she was unaware of the approval process, doc. 33-5, at 115.

Nevertheless, Campos testified that after she gave her application to Paden, he failed to submit it to human resources or to Larry Coleman ("Coleman"), Benchmark's then quality control director. *Id.* at 119-20.  As a result, Campos complained to Higginbotham, asserting that "I have been discriminated because he [Paden] is hiding my application somewhere.  He doesn't want me to apply for the quality control position, the permanent full-time position." *Id.* at 194.  When Higginbotham called Paden to inquire about the application, Paden told her that Coleman had the application.  Doc. 33-3, at 38.  Indeed, Paden testified that he gave Campos' application to Coleman.  Doc. 33-4, at 94.  Logan also testified that "Larry Coleman, the Quality Manager, had her application, so if another position is posted, he could submit her application."  Doc. 33-1, at 36.  Interestingly, Coleman testified that he had no recollection of receiving a paper application from

Paden or Campos and that he is unaware of Benchmark posting unapproved job positions or that any Benchmark quality auditor positions were available in April or May 2008.  Doc. 33-2, at 43-44.  In any event, Campos also complained to Logan that she thought Benchmark was not responding to this April 2008 application because of her national origin.  *Id.* at 60.  In response, Logan asked Campos whether this was a "formal complaint," and, according to Logan, Campos responded in the negative and stated that she "just wanted to make sure her application was turned in."  *Id.* at 60-61, 114.

Campos began some form of "article inspection" training with Benchmark employee David Gordy in April 2008.  Doc. 33-5, at 127.  Campos claims, however, that Paden interfered by assigning Campos work in the Materials Review Board ("MRB") facility or warehouse thereby decreasing her time for this new training.  *Id.* at 130.  Campos also provides that Paden failed to provide the proper computer software or equipment to adequately complete this training, and when Campos asked Paden about the deficiency, Paden responded "Well, you will see what is going to happen."  *Id.* at 135-37.  Campos also purportedly complained to Logan and Higginbotham about Paden assigning her to work in the MRB facility or warehouse.  *Id.* at 158.  Paden disputes this allegation and testified that he created a training packet for Campos regarding Incoming Quality Assurance ("IQA"), *see* doc. 33-4, at 131, 198-99, but the employees training Campos told Paden that "she was having a hard time grasping the concept of IQA," *id.* at 131.  As such, Paden wanted Campos to "cross-train" in the MRB facility when she had

time from her OBA work.  *Id.* at 66-67, 132, 194-95.  Similarly, Logan provided

that "at one point [Campos] wanted to become full-time.  They did not have an

opening at that time to be full-time.  But it was in the works of a Quality Tech job

coming available.  And they were going to give her the material that she would

need to get training for that.  So when that position came available, she could

apply."  Doc. 33-1, at 29.  Campos denies receiving any written training materials

from Paden.  Doc. 33-5, at 130.

Campos further contends that Benchmark treated Shelly Markum, a

Caucasian woman and regular Benchmark employee, more favorably by providing

Markum training and a promotion in the beginning of 2008.  Doc. 33-5, at 164.

Similarly, Campos provides that Estella Davis, an African American woman and

Coast Personnel employee, received better "mechanical technician" training

allowing her to perform "more skilled" work.  *Id.* at 217, 222, 248.  Finally,

Campos claims that Benchmark treated Becky Moore, a Caucasian woman and

Coast Personnel employee, more favorably because she too received better

training.  *Id.* at 220-22.

The parties disagree on the events that led to Campos' discharge.  Coleman

testified that Campos came to his office two weeks before her termination and

requested "to be trained for an inspector position that I told her I did not have

available, that there was a potential down the road that I could and was willing to

give her training when she was not doing her typical - - her day-to-day work."

Doc. 33-2, at 12-13.  Accordingly, Coleman asked Paden and Shelly Markum to

train Campos for an inspector position.  *Id.* at 16-17.  Coleman provided that

subsequently, on May 13, 2008, Campos "demanded to be trained full time until

she was qualified and then for [Coleman] to give her an inspector job."  *Id.* at 17.

Coleman informed Campos that he could not accommodate this request, at which

point Campos "became irate and said that I was holding her back, that I was a

racist, that I was holding her nationality against her."  *Id.* at 18.  Coleman testified

that he attempted to explain to Campos that he had no such position available, but

Campos "kept calling [Coleman] a racist even to the point where she was calling

[Coleman] a racist pig."  *Id.* at 18-19.  Coleman purportedly called Logan to join

them in his office, and Logan also attempted to calm Campos down; however,

Coleman stated that Campos "continued to raise her voice and yell - - it was

mostly pointed at me about being a racist pig.  And at that point I can't have an

employee working for me that is screaming and yelling at me, so at that point I

terminated her."  *Id.* at 19.

Logan corroborated Coleman's testimony that Coleman called her to his

office for a meeting with Campos, and that "they started talking about [Campos']

training for her job, that she wanted to train eight hours a day for the job that they

had offered her the material on.  But she couldn't train eight hours a day because

she still had her other function of her job that she was doing."  Doc. 33-1, at 41.

Logan also provided that Campos "wanted written a guarantee that when this job

comes available, that she would get the job," but Coleman informed Campos that

he could not provide this written guarantee.  *Id.* at 42.  Eventually, Logan asserted,

Campos "escalate[d] her voice. I asked her to calm down, and she wouldn't calm down. And then it escalated to the point of that she called Mr. Coleman a racist pig. And looked at me and called me a racist pig. And at that time, Mr. Coleman told her that her services were no longer needed at Benchmark." *Id.* at 44. Indeed, Logan provided that Coleman discharged Campos for insubordination because she called him a racist pig. *Id.*

Campos offers a different version of the events. Specifically, Campos maintains that, on May 13, 2008, Logan called her into Coleman's office, where Coleman informed Campos that he planned to transfer her from her position as an OBA to the MRB facility but still under the supervision of Paden. Doc. 33-5, at 168-69. Campos provided that she responded "David Paden? Why you going to send me to David Paden? You know, why are you going to send me *if he's treated me that way*?" Coleman then purportedly stated "You know what, You are done with Benchmark," and Logan furthered "You are terminated." *Id.* at 169 (emphasis added). Campos also testified that she never called Coleman or Logan a "racist." *Id.* at 172-73. Rather, Campos provided that she said "[y]ou are discriminating [against] me because I'm Hispanic, and what you just did is discriminating [against] me." *Id.* at 173. After being escorted out of Benchmark's HSI facility, Campos went to Benchmark's Bradford facility and complained to Robinson, Benchmark's human resources director, about her termination. *Id.* at 201. Furthermore, Lanier asserted that "[f]ollowing Ms. Campos's termination I recall Toni Gipson a white female taking over Plaintiff's job duties." Doc. 36-4.

After her termination, Campos applied—through Coast Personnel—for a quality control technician position at "SCI" and another quality position with General Electric.  Doc. 33-5, at 232.  Campos interviewed for the SCI position but neither company hired her.  *Id.* at 234-36.  *See also* doc. 33-1, at 51.  However, as it relates to the SCI position, the SCI interviewing supervisor requested a hold on Coast Personnel hiring for this position.  Doc. 33-7, at 2.

Campos filed separate but virtually identical Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Benchmark and Coast Personnel on July 28, 2008, alleging race, national origin, and retaliation discrimination.  Doc. 17, at 7, 9.  On April 5, 2010, the EEOC issued a Determination against Benchmark that "the evidence obtained during the investigation establishes reasonable cause to believe Charging Party was discharged and disqualified for permanent employment in retaliation for opposing practices made unlawful under Title VII."  *Id.* at 12.  Similarly, on the same date, the EEOC issued a Determination against Coast Personnel that "the evidence obtained during the investigation establishes reasonable cause to believe that Charging Party was terminated from a contractual placement employer, and not given other assignments because of her opposition to practices made unlawful under Title VII."  *Id.* at 14.  However, after conciliation failed, the EEOC issued Notice of Right to Sue letters to Campos on June 17, 2010.  *Id.* at 17, 19.  Campos filed suit against Benchmark and Coast Personnel on September 15, 2010, alleging race and national origin discrimination and retaliation.  *See generally* doc. 1.  Both

Defendants moved for summary judgment, docs. 29, 31, which are fully briefed,

docs. 35, 40, 41, and ripe for review.

## III.   ANALYSIS

Campos alleges that Benchmark violated Title VII and 42 U.S.C. § 1981 by

discriminating against her "because of her race (Hispanic) and her national origin

(Mexican) in wages, job assignments, terminating her, disqualifying her for a full

time permanent position[,] and refusing to hire her."  Doc. 1, at 8.  Similarly,

Campos contends that Benchmark retaliated against her in violation of Title VII

and § 1981 "in job assignments, by terminating her, by disqualifying her for a full

time permanent position, and by refusing to hire her."  *Id.* at 9.  As it relates to

Coast Personnel, Campos alleges discrimination "in wages, job assignments,

terminating her, and refusing to assign her jobs" and retaliation "in job

assignments, by terminating her, and by refusing to assign her jobs."  *Id.* at 8-9.

The court will address the claims against each defendant in turn.[1]

However, before discussing each claim, the court notes that Title VII and §

1981 discrimination and retaliations claims "have the same requirements of proof

and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc.*, 161

F.3d 1318, 1330 (11th Cir. 1998).  Therefore, the court "shall explicitly address

---

[1] Out of an "abundance of caution," both Benchmark and Coast Personnel address a potential hostile work environment claim.  *See* doc. 30, at 7; doc. 32, at 26.  However, Campos never alleges a hostile work environment in her complaint, *see generally* doc. 1, and never addresses such a claim in her opposition to the motions for summary judgment, *see generally* doc. 35.  As such, the court finds no need to consider a hostile work environment claim.

the Title VII claim[s] with the understanding that the analysis applies to the §

1981 claim[s] as well." *Id.  See also Jimenez v. Wellstar Health Sys.*, 596 F.3d

1304, 1312 (11th Cir. 2010) (holding that the Eleventh Circuit "routinely and

systemically group[s] Title VII and § 1981 claims for analytic purposes").

**A.    Benchmark**

    *i.    Job Assignments and Training Discrimination*

  Title VII "makes it unlawful for an employer to 'discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race [color, religion, sex, or national

origin].'" *Brown v. Ala. Dep't Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)

(quoting 42 U.S.C. § 2000e-2(a)(1)).  Implicit in a claim for race or national origin

discrimination is the contention that some racial or national origin animus factored

in the adverse employment action at issue.  "[A] plaintiff may use three different

kinds of evidence of discriminatory intent: direct evidence, circumstantial

evidence or statistical evidence.  The analytical framework and burden of

production varies depending on the method of proof chosen." *Standard*, 161 F.3d

at 1330.

    Campos attempts to offer direct evidence of race and national origin

discrimination as it relates to her job assignments and training with Benchmark.

*See* doc. 35, at 21-25.  The Eleventh Circuit provides that direct evidence of

discrimination  is "evidence which reflects a discriminatory or retaliatory attitude

correlating to the discrimination or retaliation complained of by the employee."

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotation marks omitted).  In other words, "[d]irect evidence is 'evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption.'" *Id.* (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  As such, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification]' are direct evidence of discrimination."  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (quoting *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999)).

Essentially, Campos' direct evidence claim is based on (1) three purported comments Paden made that arguably reveal some discriminatory animus[2] and (2) certain actions Paden took that allegedly had an adverse effect on Campos' employment.[3]  However, proof that Paden discriminated against Campos in job assignments and training requires some inferential or presumptive step—i.e., a reference to Campos' "Chicano accent" and a subsequent assignment to work in the MRB warehouse fails to meet the threshold of direct evidence of racial

---

[2] These comments include: a remark about Taco Bell, doc. 33-5, at 87-89, the statement "I won't make my team to learn Spanish," *id.* at 93-94, and a comment about Campos' "Chicano accent," *id.* at 101-02.

[3] These "adverse employment actions" include: Benchmark hired Campos as an In-Process Inspector, but Paden changed her permanent job title to "Out-of-Box Auditor;" Paden failed to properly submit Campos' Quality Tech I application; Paden interfered with Campos' First Article Inspection training by not providing the proper training materials, and Paden assigned Campos work in the MRB warehouse.  *See* doc. 35, at 21-24.

discrimination.   For example, the Eleventh Circuit in *Wilson v. B/E Aerospace* found *no* direct evidence of sex discrimination where defendant's decisionmaker told the female plaintiff, prior to her not receiving a promotion, "even though women aren't typically in that type of position we'll see what happens when we throw your name out there to corporate." 376 F.3d at 1086.  Similarly, in *Burrell* the Eleventh Circuit found no direct evidence of sex discrimination when, about a year before her termination, plaintiff asked for an executive vice president position and defendant "responded that he wanted to hire a man for the position because too many women filled First Federal's officer positions." 125 F.3d at 1393.

Conversely, in *Caban-Wheeler v. Elsea*, 71 F.3d 837, 843 (11th Cir. 1996), the court found direct evidence of racial discrimination where defendant stated that he wanted an African American person to have the white plaintiff's job. *See Wilson*, 376 F.3d at 1087 (discussing the direct evidence of discrimination in *Caban-Wheeler*).  Stated simply, an "example of direct evidence [of age discrimination] would be a management memorandum saying, 'Fire [plaintiff]-he is too old.'" *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  Here, Campos' evidence regarding Paden's statements, "at most, *suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence; by definition then, the evidence is circumstantial." *Id.* at 1081-82 (emphasis in original).  Indeed, taking the evidence in the light most favorable to Campos, Paden made some derogatory comments—but, these comments contain little, if any, correlation to the adverse actions purportedly taken by Paden.

However, regardless of Paden's comments, Campos also fails to establish an adverse employment action as it relates to her job assignments and training at Benchmark. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (plaintiff must establish an "adverse employment action" to succeed under Title VII).[4] "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (emphasis in original).

Campos first contends that she "was hired as an In-Process Inspector, but Paden changed her permanent job title to 'Out-of-Box Auditor' . . . which was a lower skilled job.  Unlike the 'In-Process Inspector' position which had many other responsibilities, including monitoring out-of-box activities, the [OBA] was only required to manually check the label boxes of the unit, and not perform any sort of other quality inspection."  Doc. 35, at 22.  This assertion is simply unsupported by any record evidence—namely, there is no evidence that Paden changed Campos' employment position immediately after Benchmark hired her.

---

[4] As Campos fails to sufficiently demonstrate an adverse employment action for her discriminatory job assignments claim, her retaliatory job assignments claim against Benchmark also fails. *See* doc. 32, at 18-22.  Accordingly, the court disagrees with Campos that Benchmark neglected to address her retaliatory job assignments claim. *See* doc. 35, at 25 n.25.  The court also refuses to consider a retaliatory training claim against Benchmark because such claim is not found in Campos' complaint. *See* doc. 1, at 9.

*See Ellis*, 432 F.3d at 1326 (establishing that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").[5]  In fact, Campos testified that she held the same position from day one:

> **Q:** "Did your position ever change?  In other words, did you start doing something other than out-of-the-box audit during your assignment at HSI?"

> **A:** "No.  I was just out-of-the-box audit."

Doc. 33-5, at 81.  Moreover, Logan offered undisputed testimony that In-Process Inspector is the same position as Out-of-Box Inspector.  Doc. 33-1, at 122.  Put differently, Campos is challenging a purported switch in positions when, in fact, the two positions are the same.

In support, Campos only offers the affidavit testimony of Sandra Lanier that "I have performed the Out of Box Auditor and the Quality Control Inspector positions and in my opinion the Out of Box Auditor position is less desirable than Quality Control Inspector position because it is more physically intensive, requires less skill, and less prestigious.  In my opinion being moved from Quality Control Inspector to Out of Box Auditor would have been a demotion."  Doc. 36-4, at 2.  While this may be true, Campos' relevant comparison is with an "In-Process

---

[5] The court disagrees with Campos' assertion that Benchmark failed to address this purported adverse employment action.  *See* doc. 35, at 22.  Benchmark sufficiently met its initial burden of demonstrating the absence of a genuine issue of material fact.  *See* doc. 32, at 19-21.

Inspector," not a "Quality Control Inspector."[6]  More importantly, the affidavit misses the mark because it lends no support to the proposition that Paden *changed* Campos' position on the first day of her employment with Benchmark.[7] Accordingly, a reasonable person could not find that Campos suffered some materially adverse employment action when Benchmark assigned her to an OBA on her first day.

Next, Campos argues that Paden's failure to submit her Quality Tech I application to the proper entities constitutes an adverse employment action. *See* doc. 35, at 22-23.  The court again disagrees because the Quality Tech I position was not yet approved by Benchmark's corporate office.  *See* doc. 32, at 24; doc. 40, at 8-9.  Higginbotham, a human resources supervisor, revealed that Benchmark posted positions at its facilities prior to actual approval, doc. 33-3, at 16, 23, and, significantly, Campos submitted a copy of the actual posting demonstrating that Benchmark's corporate office had yet to approve the Quality Tech I position, doc. 36-5, at 1.  Moreover, Coleman testified that, while unaware of the policy for posting jobs, no "quality tech one" positions were available in April or May 2008. Doc. 33-2, at 44.  Accordingly, even if Paden failed to properly submit Campos'

---

[6] Campos claims that when Lanier "refers to the quality control inspector position she is speaking about the 'In-Process Inspector' position." Doc. 42, at 3.  However, Campos fails to offer any evidence supporting this assertion clarifying the Lanier Affidavit.

[7] Benchmark moved to strike this paragraph of Lanier's affidavit for various reasons.  *See generally* doc. 39.  As the court considered this paragraph, but ultimately found no adverse employment action, the court **DENIES** this aspect of Benchmark's motion as **moot**.

application to Coleman or human resources, Campos suffered no "*serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239. Put differently, Campos claims a speculative, as opposed to tangible, adverse employment action because the job application at issue sought a non-existent position. *See id.* ("[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.").

Finally, as it relates to training and job assignments, Campos maintains that Paden interfered with her "article inspection" training by not providing proper training materials and by assigning her duties with the MRB. *See* doc. 35, at 23. Taking the facts in the light most favorable to Campos, Paden refused to allow Campos to train for certain techniques used in "First Article Inspection." However, this denial fails to establish an *adverse change* to Campos' employment with Benchmark. Campos' allegations focus on a failure to train for a different position, rather than failure to properly train for her existing position. Thus, as this training relates to a separate employment position with Benchmark—a position not even available at the time—Campos fails to demonstrate a tangible adverse employment action. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406-07 (5th Cir. 1999) ("There is no reasonable basis on which to conclude that a denial of such training, *so peripheral to* [plaintiff's] *main duties as a tax processor*, would 'tend to' result in a change of employment status, benefits or responsibilities.") (emphasis added).

Similarly, the court refuses to find that Campos' assignments in the MRB

warehouse constitute an adverse employment action.  The Eleventh Circuit instructs that "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis*, 245 F.3d at 1245.  A change in work assignment "may be so substantial and material that it does indeed alter the 'terms, condition, or privilege' of employment;" however, "where, as here, the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification," there is no tangible adverse employment action.  *Id.*  Indeed, Campos admits that, even though Paden assigned her temporary work with the MRB, she suffered no wage decrease or permanent job reclassification.  Doc. 33-5, at 142-44.[8]

Alternatively, even if the court assumes that Campos suffered some adverse employment action with her job assignments and training at Benchmark, there is insufficient circumstantial evidence of race or national origin discrimination. When a plaintiff relies on circumstantial evidence to show discriminatory intent, the court applies the burden-shifting framework established in *McDonnell*

---

[8] Campos argues that "[i]n determining whether the requisite level of adversity is reached, it is necessary to examine the alleged adverse actions in the aggregate."  Doc. 35, at 16.  While this may be true, even considering Paden and Benchmark's conduct in the aggregate, the court still finds insufficient adverse employment action to allow this claim against Benchmark to survive summary judgment.

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9]  Under the *McDonnell Douglas*

framework, the plaintiff must first create an inference of discrimination by

establishing a *prima facie* case of discrimination.  *Burke-Fowler v. Orange Cnty.,*

*Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted).  If the plaintiff

satisfies his initial burden, "then the defendant must show a legitimate,

non-discriminatory reason for its employment action."  *Id*. (citation omitted).  "If it

does so, then the plaintiff must prove that the reason provided by the defendant is

a pretext for unlawful discrimination." *Id*. (citation omitted).  However, "[t]he

ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff."  *Springer*

*v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007)

(citation omitted).  Moreover,  "[t]o establish a *prima facie* case for disparate

treatment in a race [or national origin] discrimination case, the plaintiff must show

that: (1) she is a member of a protected class; (2) she was subjected to an adverse

employment action; (3) her employer treated similarly situated employees outside

of her protected class more favorably than she was treated; and (4) she was

qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323; *see also Coutu v.*

*Martin Cnty. Bd. of Cnty. Com'rs*, 47 F.3d 1068, 1073 (11th Cir 1995)

(establishing the same *prima facie* elements for a national origin discrimination

---

[9] While Campos mentions the circumstantial evidence standard, *see* doc. 35, at 15, she never actually attempts to satisfy this standard as it relates to job assignments, training, or even wages.  *See id.* at 21-25.

claim).

Here, in addition to offering no adverse employment action, Campos fails to provide a satisfactory comparator—or similarly situated employee—as it relates to job assignments and training.  *See Wilson*, 376 F.3d at 1091 ("The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects'") (quoting *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1060 (11th Cir. 1994)).  At deposition, Campos made blanket assertions that Benchmark treated her less favorably than Shelly Markum, Estella Davis, and Becky Moore as it relates to job training.  *See* doc. 33-5, at 164, 217, 221-22, 248.  However, Campos never addresses Benchmark's argument that she is not similarly situated to these three employees.  *See* doc. 32, at 25-26; *see generally* doc. 35.  Moreover, Campos offers no other comparator evidence—therefore, the court cannot reasonably infer circumstantial evidence of discrimination when Campos fails to satisfy two of the four *prima facie* elements.

In sum, there is insufficient evidence to raise the reasonable inference that Campos suffered a *serious and material* change in the terms, conditions, or privileges of her employment as it relates to job assignments and training. Additionally, Campos fails to produce sufficient direct or circumstantial evidence of discriminatory animus in job assignments and training.  Thus, the court **GRANTS** Benchmark's motion for summary judgment on these claims.

    *ii.*    *Wage Discrimination*

To support her claim for wage discrimination, Campos states that Coast

Personnel assigned her to work for Benchmark "from September 2006 through May 2008, only interrupted by a two (2) month layoff.  As a Benchmark 'Quality Control Auditor' Campos was paid \$9.50/hr, but as a Benchmark 'In-Process Inspector' her hourly rate was reduced to \$9.00/hr.  Campos alleges this reduction in pay is an adverse employment action."  Doc. 35, at 21.  Campos produces no direct evidence of wage discrimination; as such, she must rely on circumstantial evidence.  *See Burke-Fowler*, 447 F.3d at 1323.  "In order to establish a *prima facie* case of intentional compensation discrimination based on race, the plaintiff must establish that: (1) [s]he belongs to a racial minority; (2) [s]he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [s]he was qualified to receive the higher wage."  *Hill v. Emory Univ.*, 346 F. App'x 390, 395 (11th Cir. 2009).  However, again, Campos neglects to offer any similarly situated Benchmark employee that received a higher wage.  Indeed, Campos fails to offer any evidence at all as it relates to wage discrimination.  *See generally* doc. 35.  Therefore, the court **GRANTS** Benchmark's summary judgment motion for the wage discrimination claim.

     iii.    *Discriminatory Discharge*

In addition to job assignment, training, and wage discrimination, Campos also brings a discriminatory discharge claim against Benchmark that is premised on circumstantial evidence.  "To establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4)

was replaced by someone outside the protected class." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). The only issue in contention for Campos' *prima facie* case is whether Benchmark replaced her with someone outside the protected class. To support this element, Campos again offers the affidavit of Sandra Lanier which provides that, "[f]ollowing Ms. Campos's termination I recall Toni Gibson a white female taking over Plaintiff's job duties." Doc. 36-4, at 2. For purposes of summary judgment, and taking the evidence in the light most favorable to Campos, this affidavit satisfies the *prima facie* case.[10] Therefore, the burden shifts to Benchmark to provide a legitimate, nondiscriminatory reason for the adverse employment action.

Coleman testified that he discharged Campos for insubordination. *See* doc. 33-2, at 19, 40. Put simply, Coleman provided, "I can't have an employee working for me that is screaming and yelling at me, so at the point I terminated her." *Id.* at 19. Insubordination constitutes a legitimate, nondiscriminatory justification for discharge, *see Godoy v. Habersham Cnty.*, 211 F. App'x 850, 855 (11th Cir. 2006) ("Defendants proffered a legitimate nondiscriminatory reason for [plaintiff's] termination—insubordination"); accordingly, the burden shifts back to Campos "to demonstrate that the defendant's proffered reason was merely a

---

[10] Benchmark moved to strike this affidavit testimony arguing that Campos failed to disclose Toni Gibson in her initial disclosures and in response to certain interrogatories. *See* doc. 39, at 2-4. Even though the court accepts this affidavit testimony, the court ultimately concludes that Benchmark is due summary judgment on the discriminatory discharge claim. Accordingly, the court **DENIES** the motion to strike as **moot**.

pretext to mask discriminatory actions." *Brown*, 597 F.3d at 1182 (citations omitted).

Campos, however, fails to offer any evidence of pretext as it relates to her purported discriminatory discharge. *See* doc. 35, at 25. To support this claim, Campos merely provides that "Coleman had no intent of firing Campos until she called him racist and said he was holding her back because of her nationality and because she was Hispanic." *Id.* While this may demonstrate an inference of *retaliation*, *see infra*, it lends no support to the discriminatory discharge claim. *See also Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) ("The plaintiff employee . . . always retains the ultimate burden of proving that he was the victim of intentional discrimination."). That Coleman discharged Campos for calling him a racist does not necessarily mean that he discharged Campos because of her race or national origin. Ultimately, to prevail, Campos must present evidence of some employee(s) outside of her protected class who engaged in insubordination and whom Benchmark retained. Unfortunately, Campos fails to offer any evidence, direct or circumstantial, that her race or national origin actually motivated Coleman to discharge her. Therefore, the court **GRANTS** Benchmark's summary judgment motion for the discriminatory discharge claim.

    *iv.*    *Retaliation*

Finally, while Coleman essentially admits to discharging Campos in

retaliation for calling him a "racist pig," *see* doc. 33-2, at 19,[11] the court also finds circumstantial evidence of retaliatory discharge.  *See also* doc. 35, at 29.  The *McDonnell Douglas* burden shifting framework also applies for Title VII retaliation claims, *Brown*, 597 F.3d at 1181, and "[a] *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.

---

[11] Coleman provided at deposition that he discharged Campos immediately after she became irate and began calling him a "racist pig," doc. 33-2, at 19-21; however, Campos testified that she has never called anyone a racist, doc. 33-5, at 172-73.  The court must take all inferences in the light most favorable to the nonmoving party, and here, Coleman's admission that he discharged Campos after she called him a racist, combined with the admission that he had no previous intention to discharge her, could constitute direct evidence of retaliation sufficient to survive summary judgment.  However, in taking the facts in the light most favorable to the nonmoving party, the Eleventh Circuit explicitly instructs:

> When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc).  Accordingly, under *Evans*, this court may not discredit Campos' testimony and find direct evidence of retaliation based solely on Coleman's different version of the facts.  However, the holding in *Evans* never proscribes the use of testimony—inconsistent with that of the nonmovant—to reveal circumstantial evidence of a retaliatory or discriminatory *intent*.

2008).  Accordingly:

> These three elements create a presumption that the adverse action was
> the product of an intent to retaliate. Once a plaintiff establishes a
> prima facie case of retaliation, the burden of production shifts to the
> defendant to rebut the presumption by articulating a legitimate,
> non-discriminatory reason for the adverse employment action. If the
> defendant carries this burden of production, the presumption raised
> by the prima facie case is rebutted and drops from the case. After the
> defendant makes this showing, the plaintiff has a full and fair
> opportunity to demonstrate that the defendant's proffered reason was
> merely a pretext to mask discriminatory actions.

*Brown*, 597 F.3d at 1181-82 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307-08

(11th Cir. 2009)).

First, as it relates to the *prima facie* elements, Campos suffered an adverse

employment action when Benchmark discharged her.  *See Doe v. Dekalb Cnty.*

*Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998) (listing involuntary termination

as an adverse employment action).  Second, Campos complained to Coleman

about Paden's purported discriminatory conduct immediately before her

discharge—a statutorily protected activity.  Campos testified that, on May 13,

2008, upon her purported reassignment to MRB by Coleman, she stated "'Under

what supervisor am I going to be working?'  And [Coleman] said, 'Under David

Paden.'  And I said, 'David Paden?  Why you going to send me to David Paden?

You know, *why are you going to send me if he's treating me that way*?'  Because

by that time - - sometime in May I already talked to Larry Coleman, as I say to

you, about the issues with David Paden."  Doc. 33-5, at 169 (emphasis added).

*See also* doc. 35, at 17, 23.  Coleman then allegedly discharged Campos.  *Id.  See also Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) ("Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter . . . .'") (quoting 42 U.S.C. § 2000e-3(a)).  At the summary judgment phase, Campos presents sufficient evidence to satisfy her initial burden that she complained to Coleman about Paden's alleged racial and national origin discrimination before her discharge.[12] While Campos' complaints were not formal charges of discrimination, they implicitly establish an opposition to purported illegal discrimination in the workplace.  *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) (holding that "[s]tatutorily protected expression includes internal complaints"); *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice

---

[12] The Eleventh Circuit provides that "[e]ven if an employment practice is not as a matter of fact unlawful, a plaintiff can establish a prima facie case of Title VII retaliation 'if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices . . . . A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.'" *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 857 (11th Cir. 2010) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis and alterations in original)).  Thus, while the court ultimately found insufficient evidence that Paden discriminated against Campos based on her race and national origin, this is not detrimental to Campos' retaliation claim because Campos' complaints against Paden were not *unreasonable* given the evidence presented.

constitutes unlawful employment discrimination.") (quotation marks and citation
omitted).

Finally, Campos sufficiently establishes a causal connection between her
complaints to Coleman and her discharge because these events occurred within
minutes of each other. *See* doc. 33-5, at 178. *See also Thomas v. Cooper
Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation
can be met by showing close temporal proximity between the statutorily protected
activity and the adverse employment action . . . . But mere temporal proximity,
without more, must be 'very close.'") (citations omitted). Benchmark, on the other
hand, argues that "[i]n her own deposition testimony, Campos indicates that her
alleged complaint to Logan and Coleman regarding racial discrimination in their
meeting on May 13, 2008, did not occur until *after* Coleman made the decision to
end her assignment." Doc. 32, at 30. The court disagrees because this
interpretation of Campos' testimony fails to take the evidence in the light most
favorable to the nonmoving party or construe the "causal link requirement
broadly." *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571 (11th Cir.
1993). Campos specifically provides that she complained about Paden's
discriminatory treatment to Coleman before Coleman discharged her, *see* doc. 33-
5, at 169, 178; as such, the "protected activity and the negative employment action
are not completely unrelated." *Reichhold Chemicals*, 988 F.2d at 1571-72.

Therefore, the burden shifts to Benchmark to provide a legitimate,
nondiscriminatory reason for the adverse employment action. In that regard,

Coleman testified that he discharged Campos for insubordination.  *See supra*; *see also* doc. 33-2, at 19, 40.  Accordingly, similar to the discriminatory discharge claim, the burden shifts back to Campos "to demonstrate that the defendant's proffered reason was merely a pretext to mask [retaliatory] actions."  *Brown*, 597 F.3d at 1182 (citations omitted).

However, unlike the discriminatory discharge claim, the court finds evidence of pretext to support Campos' retaliatory discharge claim.  Specifically, Coleman's testimony that he discharged Campos immediately after she called him a "racist" and "racist pig," *see* doc. 33-2, at 19, 21-22, 39-40, raises a reasonable inference of a retaliatory animus.  *See* doc. 35, at 29.  In other words, even without accepting Coleman's version of the facts to the discredit of Campos' version, *see Evans*, 407 F.3d at 1278, Coleman's testimony—as the Benchmark employee that discharged Campos—offers sufficient evidence of a retaliatory *intent*.  Indeed, in the memorandum Coleman provided to Benchmark regarding Campos' termination, he stated "[Campos] kept demanding that I make her a full time employee until I could no longer accept her insubordination.  I then offered her a position entering data with no opportunity for a full time position.  She then began calling me a racist.  I then explained to her that Benchmark no longer needed her services."  Doc. 36-6, at 1.

Taken in the light most favorable to Campos, Coleman's admission of discharging Campos for the "racist" accusation "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder

to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). *See also McClain*, 131 F.3d at 964-65 ("[A] plaintiff can survive a motion for summary judgment . . . simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons."). Moreover, in weighing the evidence in the light most favorable to the nonmoving party, Campos contends that Coleman discharged her when she complained about Coleman's decision to reassign her to Paden's supervision—an individual she complained about previously. The decision to discharge Campos shortly after this protected activity creates a quintessential issue of fact for a jury to resolve. Therefore, as a jury is best suited to determine whether Benchmark discharged Campos in retaliation for her race and national origin discrimination complaints, the court **DENIES** Benchmark's motion for summary judgment on this claim.

## B.    Coast Personnel

Coast Personnel's separate motion for summary judgment incorporates the arguments made by Benchmark and also asserts additional justifications for summary judgment. *See* doc. 30, at 5-10. First, as it relates to the discriminatory wage claim, Coast Personnel contends that it "was not involved in the decision regarding Campos' pay rate at [Benchmark]. [Benchmark] management determined the rates of pay for Coast employees assigned to work for

[Benchmark]." Doc. 30, at 6-7. Campos fails to refute this assertion in her opposition to summary judgment, *see generally* doc. 35; and indeed, Logan—Coast Personnel's onsite supervisor— testified that Benchmark set the pay rates. Doc. 33-1, at 19.[13] Without the authority to set Campos' wage rate, Coast Personnel could not have taken any discriminatory action. Therefore, based on this undisputed evidence, and the court's aforementioned reasons in the section addressing Campos' wage discrimination claim against Benchmark, *see supra*, the court **GRANTS** Coast Personnel's summary judgment motion on the wage discrimination claim.[14]

Second, Campos asserts a discriminatory discharge and a retaliatory discharge claim against Coast Personnel. Similarly, however, Coast Personnel provides that "[i]t is undisputed that Coast was not involved in the decision to end Campos' assignment with [Benchmark]; instead, [Coleman], the director of quality at [Benchmark], made the decision to end Campos' assignment based on her

---

[13] Campos asserts at deposition that Cagle, a Coast Personnel employee, set her pay rate with Benchmark, doc. 33-5, at 76-77; however, Campos never raises this testimony in opposing summary judgment; fails to provide any additional support for this assertion; and, even if true, there is no direct or circumstantial evidence of discrimination relating to wages. *See supra.*

[14] Moreover, Campos asserts discrimination and retaliation claims against Coast Personnel for "job assignments" and "refusal to assign jobs." To the extent that Campos bases these claims on her work assignments with Benchmark—it is unclear from the complaint and opposition to summary judgment—the court **GRANTS** Coast Personnel's summary judgment motion. In short, Campos submits no evidence that Coast Personnel was involved in her work assignments with Benchmark. *See* doc. 41, at 6-7. Additionally, there is insufficient evidence of discrimination or retaliation in Benchmark's conduct as it relates to work assignments. *See supra.*

insubordination."  Doc. 30, at 6.  Again, Campos neglects to address this argument in her opposition to summary judgment, *see generally* doc. 35, and the court is unable to find any evidence that Coast Personnel contributed to the decision to discharge Campos.  *See* doc. 33-2, at 19 (Coleman testifying that he made the decision to terminated Campos); doc. 33-1, at 44-45 (Logan testifying that Coleman discharged Campos from Benchmark).  Thus, the discrimination and retaliation claims against Coast Personnel regarding Campos' discharge from Benchmark fail as a matter of law, and the court **GRANTS** Coast Personnel's summary judgment motion for these claims.

Finally, Campos alleges that Coast Personnel discriminated and retaliated against her by failing to find her other temporary employment after the discharge from Benchmark.  *See* doc. 35, at 20.  Specifically, Campos testified that, following her discharge from Benchmark, she submitted two applications for temporary positions through Coast Personnel and interviewed for a quality control position at SCI.  Doc. 33-5, at 232.  At the interview, SCI supervisor Bob Moon purportedly provided, "'I really want to hire you because you have knowledge in quality control, and I like your resume and your experience,' but by the end, he told me that Phillip Cagle [Coast Personnel employee] is the one who is going to have the last word."  *Id.*  Thus, Campos' apparent theory of liability against Coast Personnel, although not expressly stated, is—following the May 13, 2008 accusations of discrimination to Coast Personnel onsite supervisor Logan and Benchmark supervisor Coleman, Coast Personnel retaliated and/or discriminated

against Campos because it prevented Campos from receiving the SCI position. *See* doc. 1, at 7.

Assuming that Campos satisfies the *prima facie* elements for these claims, which the court is hesitant to assume given that Campos never explicitly discusses her *prima facie* case, Coast Personnel provides an undisputed legitimate business reason for Campos not receiving the SCI position. *See* doc. 30, at 9; *see also Burke-Fowler*, 447 F.3d at 1323. Campos' interview form for the SCI position reveals that the SCI supervisor requested a "hold" on hiring for the position. *See* doc. 33-7, at 2; doc. 36-3, at 17. Accordingly, the court finds no reasonable inference of discrimination or retaliation where SCI, rather than Coast Personnel, decided not to hire an employee in the position for which Campos applied. *See* doc. 30, at 9. And indeed, Campos also fails to address this non-discriminatory business decision provided by Coast Personnel. *See generally* doc. 35. Therefore, absent any other specific allegations of retaliation or discrimination, the court **GRANTS** Coast Personnel's motion for summary judgment on these claims.

## IV.   CONCLUSION

Campos may proceed to trial on her claim for retaliatory discharge against Benchmark. All other claims and defendants are hereby **DISMISSED with prejudice**.

Done the 6th day of June, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE